IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| EARLENE BENTON, | ) |
| | ) No. 2:17-cv-01623-DCN |
| Plaintiff, | ) |
| | ) **ORDER** |
| vs. | ) |
| | ) |
| BULLDOG TOURS INC, AMERICAN | ) |
| COLLEGE OF THE BUILDING ARTS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

This matter is before the court on defendants Bulldog Tours Inc ("Bulldog Tours") and American College of the Building Arts' ("ACBA") (together, "defendants") motion for summary judgment, ECF No. 49. For the reasons set forth below, the court denies the motion for summary judgment.

## I. BACKGROUND

This case arises out of plaintiff Earlene Benton's ("Benton") visit to the old city jail ("the jail") at 21 Magazine Street in Charleston, South Carolina, on or about December 26, 2014, to participate in a tour operated by Bulldog Tours. ACBA owned the jail at the time of her visit.[1] Benton participated in a night-time "ghost tour" with a group of about twenty people that runs daily at the jail. While descending a flight of stairs at the jail during the tour, Benton slipped and broke her ankle, requiring surgery. She claims to have fallen because the inadequate lighting on the stairway made it

---

[1] Benton brings this action against both Bulldog Tours and ACBA as the joint operators of the jail, alleging that both defendants had control over the property and should thus be responsible for her injuries. Neither defendant has contested in the motion for summary judgment that they both operated and controlled the jail, even though ACBA was the only official owner, while Bulldog Tours ran the tours.

1

impossible to see the steps. Benton filed suit on June 21, 2017, alleging negligence, gross negligence, and recklessness on the part of both defendants. On December 28, 2018, defendants filed a motion for summary judgment. ECF No. 49. On January 23, 2019, Benton filed her response in opposition. ECF No. 59.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party. Id. at 255.

## III.  DISCUSSION

Defendants ask the court to grant summary judgment on all of Benton's claims, arguing that she has failed to present any evidence of defendants' liability and that she was contributorily negligent as a matter of law. The court disagrees with both arguments.

2

To bring a successful negligence claim, a plaintiff must demonstrate that: (1) the defendant owed her a duty of care; (2) the defendant breached this duty; (3) the breach proximately caused the plaintiff's injuries; and (4) the plaintiff suffered an injury. Dorrell v. S.C. Dep't of Transp., 605 S.E.2d 12 (S.C. 2004). Property owners owe a duty of care to those on their property. Larimore v. Carolina Power & Light, 531 S.E.2d 535, 538 (S.C. Ct. App. 2000). This duty varies depending on whether they are adult trespassers, invitees, licensees, or children. Id. An invitee is "a person who enters onto the property of another at the express or implied invitation of the property owner." Id. "The visitor is considered an invitee especially when he is there upon a matter of mutual interest or advantage to the property owner." Sims v. Giles, 541 S.E.2d 857, 861 (S.C. Ct. App. 2001). "In premises liability cases, the invitee is offered the utmost duty of care by the landowner . . . ." Id. "The degree of care required is commensurate with the particular circumstances involved, including the age and capacity of the invitee." Larimore, 531 S.E.2d at 538. The parties do not dispute that Benton was an invitee.

"A property owner owes an invitee or business visitor the duty of exercising reasonable or ordinary care for his safety and is liable for injuries resulting from any breach of such duty." Sides v. Greenville Hosp. Sys., 607 S.E.2d 362, 364 (S.C. Ct. App. 2004). Generally, property owners only have a duty to warn invitees of "latent or hidden dangers of which the property owner has or should have knowledge," and are not obligated to warn others of "open and obvious conditions." Id. Notably, however, even if a danger is open and obvious, a property owner can still be liable for physical harm caused to invitees if the "possessor should anticipate the harm despite such [ ] obviousness." Sims v. Giles, 541 S.E.2d at 863 (quoting Restatement (Second) of Torts §

3

343 A (1965), as adopted by the South Carolina Supreme court in <u>Callander v. Charleston Doughnut Corp.</u>, 406 S.E.2d 361 (1991)). This duty "includes refraining from any act which may make the invitee's use of the premises dangerous or result in injury to him." <u>Id.</u> The property owner need not necessarily foresee the specific manner in which the invitee sustained her injuries. <u>Hughes v. Children's Clinic, P.A.</u>, 237 S.E.2d 753 (S.C. 1977). Rather, "it is sufficient that there is a reasonable generalized gamut of greater than ordinary dangers of injury and that the sustaining of the injury was within this range." <u>Id.</u> It then becomes a "jury question whether the defendant has provided reasonably safe premises" for the invitee. <u>Id.</u>; <u>see</u> also <u>Creech v. S.C. Wildlife & Marine Res. Dep't</u>, 491 S.E.2d 571, 574–75 (S.C. 1997) (considering the absence of a railing on one side of a dock to be an open and obvious danger but finding that the defendant should have anticipated someone, like plaintiff, falling off the dock); <u>Callander</u>, 406 S.E.2d at 361 (finding a chair's missing seat at a doughnut shop to not be a latent defect, but deciding nonetheless that the shop was not entitled to directed verdict because of evidence that the shop knew that senior citizens frequently "backed onto their chairs and that, therefore, they might not notice a defect in a chair").

The court must first determine whether the staircase upon which Benton fell constitutes a latent or hidden danger, which would create a duty by defendants to warn her about the stairs. A jury could reasonably find that the stairs were a hidden danger or defect, based on Benton's testimony that she could not see them. Tripping upon a step that you cannot see because of inadequate lighting is, by definition, a "hidden" danger. Defendants also clearly had knowledge that the building was dark, and the tour guide, Glenn McKenzie ("McKenzie"), knew how dark the stairs were that day as he led the

tour.  A jury could find that defendants did or should have known that a tour participant could have trouble seeing the darkened steps—the dangerous condition—as they descended the staircase.  Furthermore, Benton presented evidence that defendants were on notice of an injury that had occurred on that very staircase.  Several months prior to Benton's injury, in October 2014, a man named Kevin Struzeski ("Struzeski") wrote to defendants asking for compensation for an injury he incurred on the ghost tour in September 2014.  ECF No. 59-9, Exhibit 9.  According to this letter, as Struzeski was walking down the stairs at the jail, he hit his knee on the wrought iron stair railing with such force that he required surgery.  He claimed to have injured himself because the lighting was so poor in the stairway that he could not see where he was going.  A jury could find from this evidence that defendants were on notice that the poor lighting conditions on the staircase created a hazard for tour participants and that they failed to exercise reasonable care for future participants like Benton.[2]

     Defendants claim that they sufficiently provided the following warnings and instructions to participants: (1) the jail is dark; (2) if you cannot see or are uncomfortable for any reason, the tour guide can get you out at any time; (3) there are stairs; and (4) you should not hesitate to use your own light.  Mckenzie Dep. 44:10–46:10.  Benton concedes that she heard McKenzie state before the tour began that it would be dark, that participants should stay together and be careful, and that they would be going up stairs.  Benton Dep. 34:10–14.  However, she contends that McKenzie did not allow them to use

---

[2]    Benton also claims that the McKenzie testified that people commonly stump their toe and stumble at the additional set of three stairs that turn to the right at bottom of the main staircase, which is why he holds his flashlight there.  Benton cites to page 70 of McKenzie's deposition in support, but has not submitted that page of his deposition to ECF, preventing the court from relying on McKenzie's alleged statement.

their cell phones to help them see where they were going. She claims that at one point in the tour she asked if they had more lights, as it was very dark. Id. 41:13–17. When it appeared there was no additional lighting, Benton asked to use the light on her cell phone, to which the guide allegedly responded "no" and that it would "take away from the effect of the tour." Id. 41:13–42:9. While defendants did warn Benton about the building as a whole being dark, the court does not find that the general warning at the beginning of the tour enables defendants to avoid liability for a dangerous condition created by a stairway not being illuminated well enough to allow patrons to see the stairs as they descend them. Additionally, as there is a genuine dispute of material fact about whether Benton was allowed to use her phone to correct the allegedly dangerous condition, it should go to the jury to determine whether (1) defendants refused to allow Benton to light her path with her own cell phone and (2) whether this refusal helped create an unreasonably unsafe environment. Finally, Benton's alleged failure to ask for McKenzie to escort her out of the tour goes more to her comparative negligence, which is a question for the jury, as discussed below.

The court also doubts whether the issuance of any "warning" about the stairs would have protected defendants from liability for injuries that occurred on those stairs during a tour. This fact pattern differs from the classic "hidden or latent danger" case, where a property owner has a duty to warn invitees of large holes or dangerous items on the property. In those cases, the owner is required to warn the invitees so that they can know to avoid them. Here, rather than warning the tour participants of a dangerous condition so that they could avoid it, McKenzie took the group directly to the allegedly dangerous condition and made them walk down a staircase that was arguably too dark.

Even assuming that this was not a hidden danger that required defendants to properly warn Benton, but was rather an "open and obvious" condition, the court finds it reasonably foreseeable that a tour participant might trip down a poorly-lit flight of stairs.[3] Regarding the lighting, McKenzie stated that while there is one automatic light on the staircase, he does not use the two overhead lights at the top of the stairs, because he finds them more disruptive than helpful to the tour. McKenzie Dep. 57:13–58. There is also a ceiling light that the guide claims to have not known how to switch on. Id. 57:3–16. He said he prefers to leave it off, as his flashlight is significantly brighter than either of the ceiling lights. Id. 57:20–24. However, as he leads the group of twenty or so people down the stairs, his flashlight is not always pointed back at the main staircase where people are still walking down. Id. 35:21–36:4. Further, Bulldog Tours' 30(b)(6) representative testified that the fire marshal instructed Bulldog Tours to install lights and reflective tape along the staircase. Lavern Dep. 46:7–9. While there is evidence that

---

[3]     There is also evidence that the stairs did not comport with modern building codes. Campbell Dep. 29:8–30:1. In 2000, the City of Charleston adopted the 2000 International Buildling Code ("2000 IBC"). Doug Smits ("Smits"), the city's local building official during this time, stated through an affidavit that the city inspected the jail and approved it for ghost tours, and that it never imposed the 2000 IBC requirements on the jail. However, defendants' expert Alan Campbell ("Campbell") testified that the geometry of the stairs does not meet the applicable requirements of the IBC, that the "riser heights" were non-uniform, the tread depths were non-uniform, and the handrail heights were not in conformance. Campbell Dep. 29:8–30:1. While it does not appear that the City required defendants to comply with the 2000 IBC, the court includes this information to highlight that the size, depth, and layout of the staircase seems to have been different than the average, modern staircase that Benton would have been used to descending. This provides even more of an incentive for defendants to provide adequate lighting to enable participants to descend the unusual staircase safely.
      The court also notes that Smits testified that the city's inspection did not reveal any objections to the lighting conditions within the jail for the operation of nighttime ghost tours. However, this inspection occurred in 2003, and as far as the court is aware, Smits has not testified about the lighting conditions at the time of Benton's fall in 2014.

there was some lighting on the stairs, and while the 30(b)(6) deposition does not specify where these lights and reflective tape were supposed to be placed, pictures submitted by Benton demonstrate that there is only reflective tape on the bottom step. ECF No. 59, Exhibits 2 and 3. A jury could find that this was inadequate.

Providing inadequate lighting and precluding tour participants from using their cell phones as supplemental lighting to descend stairs could be found by a jury to constitute acts that "make the invitee's use of the premises dangerous." Simms, 541 at 863. Thus, it is a question for the jury whether defendants provided a reasonably safe premises for Benton. See Bruno v. Pendleton Realty Co., 124 S.E.2d 580, 581–82 (S.C. 1962) (finding that it was a question for the jury whether property owner had exercised ordinary care to keep in a reasonably safe condition those portions of his premises frequented by business invitees when there was more than one reasonable inference that could be drawn from the evidence before the court). Additionally, the degree of care required by property owners corresponds to the age and capacity of invitees. As a tour company that presumably offers tours to people of varying ages, weights, and physical ambulatory abilities, a jury could find that defendants should have taken even greater precautions to ensure the safety of their customers.

The majority of defendants' motion for summary judgment is devoted to Benton's own negligence for her injuries. They argue that Benton's negligence is clearly greater than any alleged negligence by defendants and that the court should find as a matter of law that her comparative negligence was over 50%, undermining any liability on the part of defendants. However, "[c]omparison of a plaintiff's negligence with that of the defendant is a question of fact for the jury to decide." Creech, 491 S.E.2d at 575. In

Creech, evidence was presented that all of the parties involved were negligent, and the court found that "the jury reasonably could have drawn many different conclusions regarding the relative fault of the parties." Id. Defendants cite to Hopson v. Clary, 468 S.E.2d 305, 308 (S.C. Ct. App. 1996) and Bloom v. Ravoira, 529 S.E.2d 710, 714 (S.C. 2000) to convince the court that summary judgment based on Benton's own negligence is appropriate here. However, in those cases, the plaintiffs "failed to present any evidence establishing negligence on the part of" the defendants. Hopson, 468 S.E.2d at 308. Here, based on the evidence presented by Benton, a jury could find that defendants were negligent and that this negligence caused Benton's injuries. Thus, the court declines to grant summary judgment based on Benton's own alleged negligence.

## IV. CONCLUSION

For the foregoing reasons the court **DENIES** the motion for summary judgment.

**AND IT IS SO ORDERED.**

                            **DAVID C. NORTON**
                            **UNITED STATES DISTRICT JUDGE**

**February 21, 2019**
**Charleston, South Carolina**